| Debtor Name | Medtruly, Inc. | Case Number | 5:23-bk-51507 |

| Fill in this information to identify the case: |
| --- |
| Debtor Name: Medtruly, Inc., a Delaware corporation |
| United States Bankruptcy Court for the Northern District of California |
| Case Number: 5:23-bk-51507 |

☒ Check if this is an amended filing

Northern District of California

# Plan of Reorganization for Small Business Debtor Under Chapter 11, Subchapter V

### Medtruly, Inc. Amended Plan of Reorganization, Dated September 27, 2024

#### Background for Cases Filed Under Subchapter V

**A.** **Description and History of the Debtor's Business**

The Debtor was formed in May 2021 as a limited liability company and later changed its status to a Delaware corporation in December 2021. The Debtor started with the goal to provide chronic care management services to polychronic adults and seniors. Initially, the company tested a direct-to-consumer business model, but the acquisition costs and churn were too high to support the business model and it proved unworkable. As such, in January 2022, the Debtor pivoted to a practice enablement platform for retiring primary care clinics. It now provides end-to-end practice management including full technology stock including EHR, practice management software, rev cycle management, and complete back-office support including finance accounting and payroll, HR such as staffing of new service lines, marketing, and legal support.

Prior to the Petition Date, the Debtor suffered under the operational mismanagement and poor leadership of the then Co-CEO, Eugene Gu[1], and Head of Operations, Park Neumann, which made it difficult for the clinics to realize their potential. At the time, the Debtor was incurring liabilities of upwards of $200,000 to $300,000 per month. In addition, clinics that were once profitable or near profitable became layered with costs and were incurring as much as $50,000 per clinic per month. In December 2022, when the Debtor was in clear financial distress, it was discovered that the two had fraudulently deceived a partnered physician owner in attempted end-run to steal his clinics. They also were found to have misused company resources to take unnecessary and gratuitous business trips, attempted wire fraud and device stealing, and hired friends and family thereby siphoning off company funds. They also took company partnerships to start a new company Cedar Care. At the direction of counsel, the Debtor took immediate action to terminate the two.

---

[1] Roy Nicholas Kwan Wo Chang ("Mr. Chang") was also a Co-CEO of the Debtor. He resigned from this position at the Debtor pre-petition. Nauman Qureshi ("Mr. Qureshi") also resigned from his officer position pre-petition. Russell Anas was appointed as the new CEO and Hassan Ramay was appointed as CRO. Mr. Chang and Mr. Qureshi are both founding members of BHG.

Case: 23-51507 Doc# 148 Filed: 10/22/24 Entered: 10/22/24 15:17:14 Page 1 of 40

After termination, operations began to turnaround. In just 11 months, the Debtor has taken the burn from $300,000 per month to $30,000 per month while still growing the patient base by 3 times.

Unfortunately, Mr. Gu and Mr. Neumann commenced what the Debtor contends is frivolous litigation against the Debtor. Despite attempts to settle the suit, the litigation remains. Between the litigation and the lack of cash flow, the Debtor was forced to file this bankruptcy case. There are insufficient funds for the Debtor to continue its operations on a going forward basis. The Debtor's goal is to confirm this Plan that will allow creditors to receive at least some return and to provide a way for contractors to continue employment with BHG. Most importantly, it allows clinics and some 6,000 patients in some of the most underserved regions of the United States to continue their healthcare. The alternative would be for the Debtor to shut down and creditors will receive nothing.

**B. Liquidation Analysis**

The Debtor has moved for a sale of substantially all of the Debtor's assets to Beyond Health Group LLP which has agreed to make such purchase for the total purchase price of $400,000 of which amount will fund the Plan.

**C. Ability to Make Future Plan Payments and Operate Without Further Reorganization.**

The final Plan payment is expected to be paid on November 7, 2026, which is anticipated to be 24 months after the Effective Date.

## Article 1: Summary

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of Medtruly, Inc., (the Debtor) from payments from Beyond Health for purchase of Debtor's asset with initial deposit and remainder paid in eight quarterly payments.

This Plan provides for:

| | |
|---|---|
| 1 | classes of priority claims; |
| 1 | classes of secured claims; |
| 1 | classes of non-priority unsecured claims; |
| 1 | classes of subordinated claims; and . |
| 1 | Classes of equity security holders. |

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan or] is unable to estimate the distribution to creditors, consistent with the liquidation analysis in Exhibit A and projected disposable income in Exhibit B. This Plan also provides for the payment of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

## Article 2: Classification of Claims and Interests

2.01    **Class 1** ........................

The claim of Beyond Health Group LLC "BHG, " to the extent allowed as a secured claim under § 506 of the Code.

2.02    **Class 2** ........................

All allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2) of the Code, and priority tax claims under § 507(a)(8) of the Code).

[Add classes of priority claims, if applicable]

2.03    **Class 3** ........................

All non-priority unsecured claims allowed under § 502 of the Code.

[Add other classes of unsecured claims, if any.]

2.04    **Class 4** ........................

All subordinated claims of the Debtor.

[Add other classes of unsecured claims, if any.]

2.05    **Class 5** ........................

Equity interests of the Debtor. [If the Debtor is an individual, change this heading to *The interests of the individual Debtor in property of the estate*.]

## Article 3: Treatment of Administrative Expense Claims, and Priority Tax Claims

3.01    **Unclassified claims**

Under § 1123(a)(1) of the Code, administrative expense claims, and priority tax claims are not classified.

3.02    **Administrative expense claims**

List of Claims and proposed treatment:

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on or before the Effective Date. |
| Ordinary-Course Administrative Claims | $0 | Unless the Debtor objects to the ordinary-course administrative claim, the claim will be allowed in accordance with the terms and conditions of the particular transaction giving rise to the ordinary-course administrative claim, and the person holding the ordinary-course administrative claim need not file any request for payment of its claim and will be paid in the ordinary course of business.<br><br>No insider and/or affiliate of the Debtor may assert an administrative claim against the Estate. |
| Non-Ordinary Course Administrative Claim | $0 | To the extent that any non-ordinary course administrative claims are allowed, they will be paid |

| | | |
|---|---|---|
| | | in full by the Debtor on the later of the Effective Date or immediately after the Court enters a final order allowing the non-ordinary course administrative claim. |
| Administrative Tax Claim | $0 | Unless the Debtor objects to an administrative tax claim or otherwise disputes the administrative tax claim in accordance with applicable law, the claim will be allowed in accordance with the terms and conditions of the particular transaction that gave rise to the administrative tax claim, and the person holding the administrative tax claim need not file any request for payment of its claim. Any allowed administrative tax claim will be paid in the ordinary course of business, currently and timely as they are incurred and billed, unless the Debtor objects to or otherwise disputes such administrative tax claim in accordance with applicable law. In an event of default, and to the extent such administrative tax claim is also secured, the payment thereof will include all costs, fees, charges and interest, if applicable, as required under 11 U.S.C. §§ 506(b) and 511, and applicable non-bankruptcy law. |
| Golden Goodrich LLP ("GG") | $200,000, estimated as of the Effective Date | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the professional fee claim, except to the extent that the holder of such claim agrees to other terms. |
| Hahn Fife & Co. | $5,000.00, estimated as of the Effective Date | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the professional fee claim, except to the extent that the holder of such claim agrees to other terms. |
| Mark Sharf, Subchapter V Trustee fees | $30,000.00, estimated as of the Effective Date | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the professional fee claim, except to the extent that the holder of such claim agrees to other terms. |
| TOTAL | $210,000.00 | |

a. Any professional seeking allowance of a professional fee claim for services rendered prior to the Effective Date in connection with the Debtor's case must (1) file their application for allowance of compensation and reimbursement of expenses on or before 45 days after the Effective Date or such other date as ay be set by the Court, and (2) have the fees and expenses allowed by a final order. Any party in interest may file an objection to such an application within the time period provided by the Local Bankruptcy Rules or within any other period that the Court sets. Persons holding professional fee claims who do not timely file and serve their applications for payment will be forever barred from asserting these claims against the Debtor or its property.

b. Claims for professional fees will be limited to $200,000. Specifically, the Debtor proposes paying Hahn Fife & Co. as well as the Subchapter V Trustee in full. Debtor's counsel will reduce its fees as necessary to remain within the $200,000 cap to Professional Fee Claims. Furthermore, after the $200,000 Initial Deposit is received, only $150,000 of the Initial Deposit will be used to pay Professional Fee Claims with $50,000 to be distributed to non-Professional Fee Claims holders. After such period, the quarterly payments shall first be applied to the remaining $200,000 cap to Professional Fee Claims with subsequent quarterly payments to be applied to non-Professional Fee Claims holders

    c.  The deadline for a party to file a motion to seek a claim for an administrative claim is ninety (90) days after the Effective Date.

Case: 23-51507   Doc# 148   Filed: 10/22/24   Entered: 10/22/24 15:17:14   Page 5 of 40

3.03  **Priority tax claims**              List each holder of a priority tax claim that will be paid

| Description | Amount Owed | Treatment |
|---|---|---|
| Internal Revenue Service ("IRS") | $200.00 | The IRS filed proof of claim no. 1 is based upon no tax returns having been filed. The Debtor is working with its accountant to provide the missing returns to the IRS. The Debtor does not anticipate owing any taxes.<br><br>To the extent that any amounts are determined to be owed to the IRS, the Debtor shall pay in full the allowed amount of such claim no more than five (5) years from the Petition Date. The claim shall accrue interest from the Effective Date on the unpaid balance of the allowed priority tax claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the allowed priority tax claim(s). The Debtor shall have the right to pay the balance of the allowed priority tax claim(s) in full at any time on or after the Effective Date without premium or penalty of any kind. Payments will be made quarterly, due on the first day of the first full quarter after the Effective Date and ending on the last such date that is no more than five (5) years after the Petition Date. |
| Franchise Tax Board ("FTB") | $2,517.28 | To the extent that any amounts are determined to be owed to the FTB, the Debtor shall pay in full the allowed amount of such claim no more than five (5) years from the Petition Date. The claim shall accrue interest from the Effective Date on the unpaid balance of the allowed priority tax claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the allowed priority tax claim(s). The Debtor shall have the right to pay the balance of the allowed priority tax claim(s) in full at any time on or after the Effective Date without premium or penalty of any kind. Payments will be made quarterly, due on the first day of the first full quarter after the Effective Date and ending on the last such date that is no more than five (5) years after the Petition Date. |

[Specify terms of treatment consistent with § 1129(a)(9)(C) of the Code].

## Article 4: Treatment of Claims and Interests Under the Plan

4.01    **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – **Secured claim** of [Beyond Health Group LLC] | [x] Impaired<br>[ ] Unimpaired | As part of the sale agreement, Beyond Health Group, LLC is waiving its Class 2 claim in its entirety |
| Class 2 – **Priority claims** excluding those in Article 3 | [x] Impaired<br>[ ] Unimpaired | The Debtor disputes the priority amount set forth in Claim No. 5 and is treating the claim as disputed. No payments will be made on account of the priority portion of Claim No. 5 unless and until it becomes an allowed non-appealable claim.<br><br>The Debtor proposes the creation of a disputed claims reserve whereby the distributing entity shall reserve for all disputed claims including the Class 2 priority claim and the Class 3 unsecured claims of Eugene Gu and Park Neumann. |
| Class 3 – **Non-priority unsecured creditors** | [x] Impaired<br>[ ] Unimpaired | General non-priority unsecured creditors are entitled to receive $200,000 less the amount required to be paid to priority and administrative claimants (other than those paid pursuant to paragraph 3.02 of the Plan).<br><br>A list of nonpriority general unsecured creditors is attached hereto as Exhibit "C". |
| Class 4 – **Subordinated claims** | [x] Impaired<br>[ ] Unimpaired | Subordinated claims will be paid pro rata from any funds that exist after payment of Class 3 creditors in full.<br><br>A list of subordinated creditors is attached hereto as Exhibit "C" |
| Class 5 – **Equity Interests** | [x] Impaired<br>[ ] Unimpaired | On the Effective Date, all existing membership interests in the Debtor will be cancelled, annulled, and extinguished. . |

**Article 5: Allowance and Disallowance of Claims**

5.01    **Disputed claim**    A *disputed claim* is a claim that has not been allowed or disallowed [by a final non- appealable order], and as to which either:

(i)    a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii)    no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

(iii)    The Debtor shall have up until 180 days after the Effective Date to file objections to claims. The Debtor may obtain an extension of this deadline by filing a motion in the Court, based upon a showing of "cause."

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 8 of 40

| 5.02 | **Disputed claim reserve** | |
|---|---|---|

Debtor will create a reserve for disputed claims.  Each time Debtor makes a distribution to the holders of allowed claims, Debtor will place into a reserve the amount that would have been distributed to the holders of disputed claims if such claims had been allowed in the full amount claimed, or, if the claim has been estimated, based on the estimated amount of such disputed claim.  If a disputed claim becomes an allowed claim, Debtor shall immediately distribute to the claimant from the reserve an amount equal to all distributions due to date under the plan calculated using the amount of the allowed claim.  Any funds no longer needed in reserve shall be distributed *pro-rata* among allowed claims in this class.

| 5.03 | **Delay of distribution on a disputed claim** | No distribution will be made on account of a disputed claim unless such claim is allowed [by a final non-appealable order]. |
|---|---|---|
| 5.04 | **Settlement of disputed claims** | The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019. |

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| 6.01 | **Assumed executory contracts and unexpired leases** | (a) The Debtor assumes, and if applicable assigns, the following executory contracts, and unexpired leases as of the effective date: See attached Exhibit "2." |
|---|---|---|
| 6.02 | **Rejected executory contracts and unexpired leases** | (a)  All contracts not listed as to be assumed and assigned under Exhibit 3 are rejected under the plan. |

(b)  The Debtor shall be deemed to reject all executory contracts and unexpired leases that are not specifically assumed in section 6.01(a) of this Plan.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than be 30 days after  the date of the order confirming this Plan.

☐                                    ☐

[Check the box for the applicable deadline for filing a proof of claim arising from the rejection of an executory contract or unexpired lease, and if no box is selected or the selection is blank, the deadline shall be 30 days after the date of the order confirming this Plan.]

## Article 7: Means for Implementation of the Plan

The Plan cannot be confirmed unless the Court finds it is "feasible;" pursuant to 11 U.S.C. §§ 1190(1)(C) and 1191(c), this means the Debtor submitted evidence establishing that the Debtor will have sufficient funds available to satisfy all expenses, including the scheduled payments to claimants. The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

Section 363(b) of the Bankruptcy Code empowers a trustee to "use, sell or       lease . . . other than in the ordinary course of business, property of the estate."    In considering a proposed transaction to use, sell, or lease, courts look at whether the transaction is in the best interests of the estate based on the facts and history of the case. In re American West Airlines, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)). This requires examination of the "business justification" for the proposed transaction. In re 240 North Brand Partners, Ltd., 200 B.R. 653 (9th Cir. B.A.P. 1996); In re Wilde Horse Enterprises, Inc., 136 B.R. 830 (Bankr. C.D. Cal. 1991); In re Ernst Home Center, Inc., 209 B.R. 974 (Bankr. W.D. Wash. 1997).

In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e., it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith and that it is an 'arms-length' transaction.

In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); In re 240 North Brand Partners, Ltd., 200 B.R. 653 (9th Cir. B.A.P. 1996). A bankruptcy court's power to authorize a sale under § 363(b) is reviewed for abuse of discretion. In re Walter, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988).

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 2010) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Resources, Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.) 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); 995 Fifth Ave., Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  In re Lajijani, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

The valuation provided at Exhibit "1" to the Plan demonstrates that the Debtor is receiving more than it would otherwise by a sale to BHG.  The characteristics of the Debtor's assets made it such that it did not find it feasible to do additional marketing. See Declaration of Jeffrey I. Golden. All evidence as to the sale and reasonableness will be presented with the Plan confirmation briefs.  Through the sale $400,000 will received by the Debtor for distribution after the Purchase Price is paid in full. The Plan contemplates a maximum of $200,000 to be paid to Professional Fee Claims, and an additional $200,000 to be distributed to creditors. The Debtor believes that without the sale no money would be brought into the estate.  BHG and the Debtor have entered into an APA and Debtor has moved for approval of the sale contemplated by the APA. As outlined in the APA, the Buyer shall pay an initial deposit of $200,000, payable on the later of (i) forty-two (42) days after execution of this Agreement or (i) fourteen (14) days after the Effective Date of this Agreement (as defined in the APA) ("Initial Payment"). Beginning thirty (30) days after the Effective Date [of the APA], Buyer shall pay equal quarterly payments in the amount of $25,000 over a period of 24 months. This will result in total plan payments of $400,000.00 with all payments being completed approximately 24 months (plus 30 days) after the Effective Date

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 10 of 40

## Article 8: General Provisions

**8.01  Definitions and rules of construction**

The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

*[Insert additional definitions if necessary].*

**8.02  Effective date**

*[Select one]*

☒ The effective date of this Plan is the first business day following the date that is 14 days after the entry of the final confirmation order, except that the requirement of finality may be waived by the Debtor. If a stay of the confirmation order is in effect on that date, the Debtor may elect to treat the effective date as the first business day after the date on which the stay expires or is otherwise terminated.

☐ The effective date of this Plan is *[describe]:*

**8.03  Vesting at Confirmation**

Property of the estate shall: *[select one]*

☐ revest in the Debtor upon confirmation of the Plan.

☒ not revest in the Debtor at confirmation but shall be delayed and thereafter vest in the Debtor at the earlier of: (a) completion of all payments due under the Plan; (b) dismissal; (c) discharge; or (d) closing of the case.

☐ [The Debtor seeks confirmation under 11 U.S.C. § 1191(a). As the Plan is a liquidating plan, the Debtor will not receive a discharge pursuant to 11 U.S.C. § 1141(d)(3).

Notwithstanding the above, no property of the Debtor shall revest in any party other than the Debtor until the plan payments have been paid in full.

**8.04  Plan Disbursements**

After confirmation, all payments due to creditors under the Plan shall be disbursed by the: *[select one]*

☒ Debtor.

☐ Subchapter V Trustee.

☐ *[describe]:*

Notwithstanding § 1194(b) of the Code, and unless otherwise ordered by the Court, Debtor shall be authorized to make all payments due to creditors under the Plan if such election is made in this section of the Plan.

If required to make distributions to creditors under the Plan or perform any post-confirmation services, the Subchapter V Trustee shall be entitled to compensation consistent with the hourly rate set forth in the *Verified Statement of Subchapter V Trustee* filed in the Case and reimbursement for all actual and necessary expenses incurred. Post-confirmation compensation due and payable to the Subchapter V Trustee may reduce payments to general unsecured creditors.

**8.05  Severability**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 11 of 40

| 8.06 | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
|------|--------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 8.07 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |
| 8.08 | **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.] |
| 8.9 | **Corporate governance** | Confirmation of the Plan shall be deemed to prohibit the issuance by the Reorganized Debtor of nonvoting securities to the extent required under § 1123(a)(6) of the Code. [Include for corporate debtors only] |
| 8.10 | **Payments** | All payments to be made under the Plan for professional services, costs, or expenses in connection with the case or the Plan as required by §§ 330 and 331 of the Code shall be subject to the approval of the court. |
| 8.11 | **Officers and Directors** | The officers and directors of the Debtor shall remain in their roles post-confirmation, |
| 8.12 | **Insider Retention** | The insiders who were employed or retained by the Debtor shall remain in their roles post-confirmation, at the same or comparable compensation. |
| 8.13 | **Defaults and Remedies** | Failure to pay any amount due under this Plan within 20 days of the due date shall constitute a Default.  Upon the occurrence of a Default, any affected creditor may give 15 days' Notice of Default.  Absent a cure within that period, the creditor may present a Motion seeking appropriate relief from the Court, which relief may but need not include conversion of the case to one under Chapter 7 of the Code.

In the event there is a Default under the Plan, or this case converts to Chapter 7, any claims that would otherwise be held by the Debtor are preserved for the Subchapter V Trustee or a future potential chapter 7 trustee as applicable. |
| 8.14 | **Retention of Jurisdiction** | The Court may exercise jurisdiction over proceedings concerning: (a) whether Debtor is in Material Default of any Plan obligation; (b) whether the time for performing any Plan obligation should be extended; (c) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan to be filed in this Court; (d) whether the case should be dismissed or converted to one under Chapter 7; (e) any objections to claims; (f) compromises of controversies under Federal Rule of Bankruptcy Procedure 9019; (g) compensation of professionals; and (h) other questions regarding the interpretation and enforcement of the Plan. |
| 8.15 | **Deadline for Election Under 11 U.S.C. § 1111(b)** | Any creditor that wishes to make an election under section 1111(b)(2) of the Code shall do so no later than 10 days following the filing of the Plan. |

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 12 of 40

## Article 9: Discharge

[Select one]

☐ Debtor is entitled to a discharge pursuant to § 1141(d)(3) of the Code.

☒ Debtor is not entitled to a discharge pursuant to § 1141(d)(3) of the Code.

[Select one]

☐ **Discharge if the Debtor is an individual under Subchapter V**

Case: 23-51507     Doc# 148     Filed: 10/22/24     Entered: 10/22/24 15:17:14     Page 13 of
40

If the Debtor's Plan is confirmed under § 1191(a) of the Code, on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. The Debtor will not be discharged from any debt excepted from discharge under § 523(a) of the Code, except as provided in Federal Rule of Bankruptcy Procedure 4007(c). Pursuant to § 1181(a) of the Code, § 1141(d)(5) of the Code does not apply.

If the Debtor's Plan is confirmed under § 1191(b) of the Code, confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the Plan's term, which could range from 3-5 years, pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

    (i) on which the last payment is due after the conclusion of the Plan's term, which could range from 3-5 years, pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code; or

    (ii) excepted from discharge under § 523(a) of the Code, except as provided in Federal Rule of Bankruptcy Procedure 4007(c).

☐ **Discharge if the Debtor is a partnership under Subchapter V**

If the Debtor's Plan is confirmed under § 1191(a) of the Code, on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code.

If the Debtor's Plan is confirmed under § 1191(b) of the Code, confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the Plan's term, which could range from 3-5 years, pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt on which the last payment is due after the conclusion of the Plan's term, which could range from 3-5 years, pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code.

☐ **Discharge if the Debtor is a corporate entity under Subchapter V**

If the Debtor's Plan is confirmed under § 1191(a) of the Code, on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt to the extent provided in § 1141(d)(6) of the Code.

If the Debtor's Plan is confirmed under § 1191(b) of the Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the Plan's term, which could range from 3-5 years, pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt on which the last payment is due after the conclusion of the Plan's term, which could range from 3-5 years pursuant to § 1191(c)(2) of the Code, or as otherwise provided in § 1192 of the Code.

## Article 10: Other Provisions

[Insert other provisions, as applicable.]

Respectfully submitted,

_Signature to be provided_

Russell Anas

_____
[Signature of the Debtor]

_____
[Printed Name]

_____
[Signature of the Co-Debtor]

_____
[Printed Name]

_____
[Signature of the Attorney for the Debtor]

_____
[Printed Name]

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 14 of 40

## Article 11: Attorney Certification

I am legal counsel for the Debtor in the above-captioned case and hereby certify that the foregoing plan is a true and correct copy of the *Plan of Reorganization for Small Business Debtor Under Chapter 11, Subchapter V* promulgated by the Northern District of California on _September 27, 2024 (the "Standard-Form Plan") and

[Select one]

☐ There are no alterations or modifications to any provision of the Standard-Form Plan;

☐ Attached hereto as **Exhibit ___** is a redline of Debtor's Plan identifying all alterations or modifications made to any provision of the Standard-Form Plan; or

☒ Below are all alterations or modifications made to any provision of the Standard-Form Plan:

   The Debtor has attached as Exhibit 1 a liquidation analysis of the Debtor.

   The Debtor has attached as Exhibit 2 a list of assumed and assigned contracts.

   Section 5.01(iii) the Debtor has added a deadline to file objections to claim.

   Additional language added to section 8.3

I declare that the foregoing is true and correct.  Executed this 22nd day of October, 2024.


/s/ Jeffrey I. Golden                                      Jeffrey I. Golden
_____                _____
[Signature of the Attorney for the  Debtor]            [Printed Name]

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 15 of 40

# EXHIBIT A



**Fair Market Value of
100% of the Enterprise Value of
MedTruly, Inc.**

**as of September 30, 2023**



# TABLE OF CONTENTS

Scope                                                                           3

Information Reviewed and Procedures Performed                                    3

Conclusion of Enterprise Value                                                   3

Conclusion of Liquidation Value                                                 4

Approach to Valuation                                                           5

Assumptions and Limiting Conditions                                             7

Certification                                                                   9

Appendix A - Business Description and Overview                                 11

Material Considerations Employed in Determining Enterprise Value               14

Material Considerations Employed in Determining Liquidation Value              14

    Valuation of Proprietary Software                      14

    Valuation of MedTruly Trademark                         15

    Valuation of Accrued Administrative Fee                 16

    Valuation of Related Party Loans to Clinics             16

Valuation Exhibits                                                             17

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 18 of
40



# Scope

Force Ten Partners LLC ("Force 10") was retained to prepare a valuation of the Fair Market Value of 100% of the enterprise value (on a going concern basis) and the liquidation value of MedTruly, Inc ("MedTruly" or the "Company") on a control marketable basis as of September 30, 2023 (the "Valuation Date").

# Information Reviewed and Procedures Performed

We reviewed several sources of information during the valuation analysis, including, but not limited to, the following:
- MedTruly prepared income statements and balance sheets for the year ended September 30, 2023;
- MedTruly prepared projection model, including both clinic and management services organization ("MSO") level details for years ending September 30, 2024, through September 30, 2028;
- MedTruly MSO agreements with clinics and related legal documentation;
- MedTruly lease agreements and associated amendments;
- Information was also gathered from the MedTruly website and other sources.

In addition to the information reviewed above, we performed the following procedures:
- Discussions with the MedTruly management concerning its business, industry, history, and prospects, and analyzed other facts and data, resulting in our conclusion of value.

# Conclusion of Enterprise Value

We reached an important conclusion upon evaluating MedTruly's enterprise value through the income approach as the controlling method (as further explained below). The Company has consistently incurred losses and shows no signs of moving toward profitability soon. This pattern of financial loss is a critical factor in our analysis.

Case: 23-51507   Doc# 148   Filed: 10/22/24   Entered: 10/22/24 15:17:14   Page 19 of 40



**The present value of future cash flow is negative.** This indicates that the Company's value-creation potential needs to be increased to cover its operational costs and financial obligations, and **the going concern value is $0 as of September 30, 2023**.

# Conclusion of Liquidation Value

Often, we distinguish between Orderly and Forced liquidation value results to determine asset value. In the instant case of MedTruly, given its insolvency and the nature of its assets, we do not do so for the following reasons.

When assessing non-wasting assets and where the associated carrying costs do not impose a meaningful financial burden on the insolvent estate and unsecured creditors, the differential in returns between Orderly Liquidation Value and Forced Liquidation Value is minimal and indistinguishable.

Non-wasting assets, by their nature, do not experience significant value degradation over time in contrast to perishable or swiftly depreciating assets. This inherent stability in value diminishes the imperative for immediate liquidation. Further, given the nature of MedTruly's assets, the limiting reagent to selling the assets will be determined by the timetable set by the parties in interest. Consequently, in such scenarios, the prospect of an orderly liquidation, predicated on a reasoned time frame, will not measurably exceed that of a forced liquidation scenario.

Additionally, in instances where the insolvent estate is not burdened by the expenses related to the upkeep of these assets — including storage, insurance, and maintenance costs — the urgency for rapid asset liquidation is mitigated. This circumstance potentially equalizes the financial outcomes between orderly and forced liquidation, thereby reducing the impact of the chosen liquidation approach on the overall economic return.

**Based on the analysis of Exhibit 1.0 and the above considerations, the Liquidation Value of MedTruly is $0 as of September 30, 2023.**



# Approach to Valuation

We considered the following valuation approaches to determine the value of MedTruly.

### Income Approach

The Income Approach estimates fair market value based on the cash flows a business could be expected to generate in the future. There are four basic steps in applying this approach. First, the annual after-tax cash flows the business will generate over a finite period are estimated. Second, these cash flows are discounted to their present value equivalents using a rate of return that accounts for the relative risk of the investment in the business and the time value of money. Third, the residual value of the business at the end of the discrete period is estimated and then discounted to its present value equivalent. Finally, the present value equivalents of the estimated annual after-tax cash flows are added to estimate the business's fair market value. The underlying theory of this approach is that the realistic valuation of any investment in an income-producing business is directly related to the future cash flow attributable to such a business. Cash flow represents the recovery of the investment and the receipt of income produced by such an investment. **We primarily employed the Income Approach to determine MedTruly's going concern valuation.** See Exhibit 2.0 in Appendix A for further details.

### Market Approach

The Market Approach estimates fair market value based on market prices in actual transactions and on asking prices for assets currently available for sale. The valuation process compares and correlates the subject business with similar businesses. Considerations such as description, size, profitability, growth expectations, and cash flows are analyzed for comparable businesses and are adjusted to indicate the current value of the subject business.
Additionally, for this approach to be reliable, there are two requisites: an active public market and an exchange of comparable businesses.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 21 of 40



*The Market Comparable Method* uses multiples observed for traded minority interest shares in active securities markets, then adds a control premium to value the business on a controlling basis.

*The Market Transaction Method* uses multiples observed in controlling share transactions in the mergers & acquisitions market.

Given the nature of the business, lack of profitability, and insolvency, we did not employ market comparability or transaction methods.

## Asset Approach

The Asset Approach is a valuation technique whereby a company's Enterprise Value or equity value is determined based on a market value balance sheet.

The principal method employed in our Asset Approach is Liquidation Value, which is the amount, net of expenses, that would be realized if the business were terminated and the assets were sold piecemeal or through appropriate groupings under a scenario whereby the purchaser(s) acquires "as is, where is" for cash or cash equivalent over a reasonable period of time to maximize proceeds received.

**We did not use the Asset Approach to determine MedTruly's going concern value. We did use the Asset Approach to determine MedTruly's liquidation value.**

## Other Considerations

Force 10 considered other factors in determining MedTruly's enterprise value, including Discount for Lack of Marketability ("DLOM"). DLOM is appropriate when the subject interest is non-marketable, yet the prior steps in the valuation process result in a marketable value. Marketability is defined in the International Glossary of Business Valuation Terms as "the ability to quickly convert the property to cash at minimal cost." Some texts add "with a high degree of certainty of realizing the anticipated amount of proceeds." A DLOM is "an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability." No DLOM is separately applied to the Income Approach because the discount is embedded in the cost of capital.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 22 of 40



Discount for lack of control ("DLOC"). DLOC is a discount for lack of control that allows investors who purchase a position in a company that affords them no actual control over the Company's actions, decisions, or other affairs to benefit from a lower purchasing price than the Company's total value may otherwise dictate. DLOC does not apply because we valued 100% of MedTruly, not a fractional interest.

# Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

In performing our analysis, we used various financial and other information provided by management or its representatives and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information by standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we do not represent the accuracy or completeness of such information and have performed no procedures to corroborate the information.

For this engagement and report, we make no investigation of and assume no responsibility for the titles to, or liabilities against, MedTruly 's assets or equity, including, but not limited to contingent or environmental liabilities.

Our value conclusion assumes the assets and liabilities presented on MedTruly's balance sheet, as of the Valuation Date, were intact as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume no hidden or unexpected conditions would adversely affect our estimated value.

We do not assure the achievability of the forecasted results. Differences between actual and expected results may be material, and achieving the forecasted results depends on management's actions, plans, and assumptions.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 23 of 40



Our conclusion of value applies to the Subject Interest for the stated date and purpose only and may not be appropriate for any other date or purpose.

The opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein. They are not to be referred to or distributed, in whole or part, without our prior written consent.

The opinions expressed herein are not intended to be investment advice and should not be construed as investment advice. Furthermore, this report does not constitute a fairness or solvency opinion regarding any contemplated present or future transaction.

None of our employees who worked on this engagement have any known financial interest in the assets or equity of MedTruly or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

We are not required to give testimony in court or be in attendance during any hearings or depositions unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

This valuation contemplates facts and conditions that are known or knowable as of the valuation date. Events and conditions occurring after the valuation date have not been considered, and we have no obligation to update our report for such events and conditions.

By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 24 of 40



# Certification

We certify that to the best of our knowledge and belief:

- The statements of fact in this report, on which the analysis, opinions, and conclusions are based herein, are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- The data used in this report was obtained from sources believed to be reliable. All facts that bear on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.
- We have no present or prospective interest in the business that is the subject of this report and no personal interest concerning the parties involved.
- We have no bias concerning the business that is the subject of this report or the parties involved with this assignment.
- Our engagement in this assignment was not contingent on developing or reporting predetermined results.
- Our compensation for completing this assignment is fee-based. It is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- Our analyses, opinions, and conclusions are developed, and this report is prepared with the intent of conforming with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation, the Principles of Appraisal Practice, and the Code of Ethics of the American Society of Appraisers.
- Force Ten Partners, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three years immediately preceding acceptance of this assignment.



Sincerely,

_____

Force Ten Partners LLC
Adam Meislik
(949) 357-2359

ameislik@force10partners.com


December 26, 2023

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 26 of 40



# Appendix A - Business Description and Overview

**Company Overview**

MedTruly is a very early-stage management services organization ("MSO") healthcare start-up that provides integrated primary and preventive care for patients with chronic conditions through its associated clinics. MedTruly provides a blend of in-person and virtual care, aiming to reduce hospital and urgent care visits. The clinics offer primary care, internal health, virtual health, remote patient monitoring, pain management, specialty care, labs, and medication. As of the Valuation Date, MedTruly had four associated clinics in Renton, WA; Anacortes, WA; Freeland, WA; and Boston, MA. MedTruly commenced operations in July 2022, when the first set of MSO agreements with clinics were executed.

Each clinic has a managed service administrative agreement in place with MedTruly. The agreements establish the services that MedTruly will provide to each clinic and the corresponding administrative fee owed to MedTruly by each clinic for those services.

MedTruly operates on a revenue model centered around administrative fees charged to its affiliated clinics. The company's contract stipulates a monthly admin fee of approximately $300,000 from each clinic. However, this fee collection is contingent on the profitability of individual clinics. If a clinic generates sufficient excess cash, the admin fee is paid. Otherwise, the fee is deferred and treated as a loan under specific terms outlined in their agreements.

The payment is only enforced if the clinics can pay the administrative fee due to sufficient profitability. This has led to a significant accrual of unpaid fees, reaching $13,073,755 as of September 30, 2023, a stark indicator of the clinics' financial struggles and MedTruly's inability to collect.

This leads to an interesting cash flow scenario for MedTruly. While the Company's five-year financial models show EBITDA at the MedTruly level, this does not directly translate into actual cash flow. To accurately gauge MedTruly's real cash position, one must account for the changes in accrued admin fees, which may have yet to be


paid due to the variable profitability of the clinics. Therefore, their cash flow is not solely the EBITDA but is adjusted by the fluctuating admin fee accruals, reflecting a more complex and dynamic financial situation that resulted in negative cash flow.

MedTruly's initial strategy was to build value by investing in technology and leveraging the clinics to establish a substantial patient base, intending to sell services in the future. However, it's too early in their business cycle to determine the effectiveness of this approach. As of the current date, MedTruly faces severe financial challenges. The Company has depleted its cash reserves and is now insolvent. The lack of progress in their technology development and the unproven nature of their profit model further exacerbate the situation, leaving the Company with no residual value. This situation highlights the risks inherent in MedTruly's business strategy and underscores the need for a more sustainable financial model.

**Recent Operating Performance**

MedTruly provided historical financial results for the fiscal year ended September 30, 2023.  Results were provided at the clinic and MSO level separately.  Total clinic-level revenue was $2.0 million with clinic gross profit at $0.8 million or 43.1% of revenue.  After clinic operating expenses of $1.1 million, clinic-level cash flow came in at a loss of -$0.2 million.  At the MSO level, MedTruly incurred additional operating expenses of $1.0 million, which puts the combined clinic and MSO level operating cash flow at a loss of -$1.2 million.

Total assets at the MSO level were $15.1 million as of September 30, 2023, with $13.1 million of total assets in an accrued administrative fee receivable due from clinics in connection with each MSO agreement.  The balance of total assets includes cash, certain capitalized technology costs, and cash support loans to clinics.  After a founder's loan of $0.1 million and safe notes of $6.3 million, book equity yielded $8.7 million.

MedTruly has not properly recorded impairments to its accrued Administrative Fee asset.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 28 of 40



**Financial Projections**

MedTruly's management provided financial projections for the period from fiscal year ending September 30, 2024 through September 30, 2028 ("FY 2024", "FY 2025", etc.).  Clinic-level revenue is expected to grow from $3.5 million in FY 2024 to $4.3 million in FY 2028.  Clinic-level gross profit is projected at $2.1 million for FY 2024 and $2.6 million for FY 2028.  From a margin perspective, clinic gross profit is approximately 60.4% over the projection period.  After clinic operating expenses, clinic-level cash flow is expected to grow from $0.7 million in FY 2024 to $0.9 million in FY 2028.  From a margin perspective, clinic cash flow ranges from 19.5% to 21.9%.  At the MSO level, MedTruly is expected to incur an additional $1.1 million of operating expenses in FY 2024 and $1.6 million for FY 2028.  Combined clinic and MSO level operating cash flow is expected to be at a loss across the projection period at -0.5 million in FY 2024 and -$0.6 million in FY 2028.  See Exhibit 2.0.

Case: 23-51507     Doc# 148     Filed: 10/22/24     Entered: 10/22/24 15:17:14     Page 29 of 40



# Material Considerations Employed in Determining Enterprise Value

Our enterprise valuation is based on projected future cash flows, a key element in the income approach. The Company's past and current financial data suggest that it is unlikely to generate positive cash flow in the foreseeable future. The Company faces significant challenges, including stiff market competition, a lack of critical mass required to achieve profitable operational inefficiencies and regulatory burdens.

Given these factors, we project that MedTruly will continue to lose money.  The only way to reverse this trend would be through a significant capital injection, a major overhaul in business operations, and the time needed to grow into economies of scale.  However, such changes are beyond expectation at MedTruly, given its lack of capital and the current market environment.

# Material Considerations Employed in Determining Liquidation Value

### Valuation of Proprietary Software

In assessing the valuation of the proprietary software developed by MedTruly, it is essential to address specific critical factors that markedly diminish its commercial viability and value.  First and foremost, the software's requirement for ongoing maintenance presents a substantial drawback.  This necessity for continual updates, debugging, and adaptation to evolving technological standards imposes a relentless financial and operational burden.  A maintenance-intensive asset is at a heightened risk of obsolescence, thereby eroding its long-term value.  Additionally, the competitive landscape must be considered.  The market availability of alternative software solutions, which may offer superior functionality, user experience, and lower maintenance needs, undermines MedTruly's software's selling proposition and marketability.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 30 of 40


Equally important is the bespoke nature of the software, tailored specifically for the company's unique workflows and operational requirements.  While advantageous for internal purposes, this customization severely restricts its appeal to external entities.  The investment required for a third party to modify, integrate, and operationalize this software within a different organizational framework is likely considerable.  These constraints make the software an unattractive acquisition for potential buyers.  Given these factors - the need for sustained maintenance, competitive market alternatives, and the highly specialized design of the software - its market value is effectively negated.  In the context of this valuation report, it is best to recognize the software as contributing minimally, if at all, to MedTruly's aggregate value, and we assign $0 to the value.

**Valuation of MedTruly Trademark**

Our evaluation maintains that the 'MedTruly' name does not inherently possess a measurable value despite its technological connotation.  Its primary association with MedTruly as a healthcare MSO significantly limits its applicability and perceived value in other sectors. This limitation arises from the mismatch between the MSO identity of the trademark and the specific branding needs or consumer expectations of different industries.

The insolvency status of MedTruly further impacts the trademark's value. Trademarks associated with distressed companies typically experience a decline in value, driven by negative market perceptions and eroding brand equity. This effect is exacerbated by the MedTruly trademark's identification with the Company rather than with a distinct product or service, reducing its utility and appeal in varied industrial contexts.

To quantify this potential value, we look towards commercial web domain valuations. These valuations provide a relevant benchmark, reflecting the monetary worth of similar healthcare-oriented names in a competitive digital marketplace. By aligning the 'MedTruly' trademark valuation with these domain metrics, we can derive a more realistic and market-aligned valuation for the trademark in the healthcare sector.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 31 of 40



The results of our investigation yield a value of $1,600 for the MedTruly trademark and domain name.

**Valuation of Accrued Administrative Fee**

The accrued administrative fee is based on the contractual language in each clinic's administrative agreement. Given the lack of sufficient cash flow (see Exhibit 2.0) and liquidation value (see Exhibit 1.0) at the clinic level, we assigned a zero value.

MedTruly's revenue model faces critical challenges. The Company charges about $300,000 monthly per clinic, but fee collection depends on each clinic's profitability. When clinics don't generate enough cash, the fee is either deferred as a loan or remains unpaid, leading to a significant accrual of $13,073,755 in unpaid fees as of September 30, 2023. This scenario has resulted in a complex and strained cash flow situation for MedTruly, where actual cash flow significantly deviates from the EBITDA figures due to these uncollected fees.

Compounding this issue is the fact that the administrative fees are unsecured, without personal guarantees, and historically have had minimal, if any, collectability.

An analysis of certain assets on the clinics' balance sheets suggests that forced liquidation would unlikely benefit MedTruly, given the minimal value of unencumbered assets and patient receivables and considering the costs associated with recovery efforts. On September 30, 2023, the clinics had $88,692 of payor accounts receivable and no more than $100,000 of equipment (MedTruly estimated $55,000).

**Valuation of Related Party Loans to Clinics**

The clinic loans are unsecured. Any recovery would be hindered by the meager proceeds from the clinic's liquidation value (which is de minimis) and be diluted by other creditors of the clinics. In addition, any claim would be further diluted by MedTruly's cost to pursue the claim.

Case: 23-51507    Doc# 148    Filed: 10/22/24    Entered: 10/22/24 15:17:14    Page 32 of 40



**Valuation Exhibits**

**MedTruly, Inc.**                                                                                              **EXHIBIT 1.0**
ENTERPRISE VALUATION
AS OF SEPTEMBER 30, 2023
NET ASSET APPROACH - LIQUIDATION VALUE
CURRENCY IN ACTUALS (unless otherwise noted)

|  | Recorded Value | Adjustment | Adjusted Value | Notes |
|---|---|---|---|---|
| Cash and Cash Equivalents | $ 6,136 | 0.0% | $ - | See (1) below. |
| Intellectual Property | 15,000 | 0.0% | - | See (2) below. |
| Trademarks - MedTruly | - | n/a | 1,600 | Based on commercial web domain valuation research. |
| Accrued Administrative Fee | 13,073,755 | 0.0% | - | See (3) below. |
| Related Party Loan: Clinics / Entities | 2,001,700 | 0.0% | - | See (4) below. |
| **Total Assets** | **15,096,591** | **0.0%** | **1,600** | |

| | | | | |
|---|---|---|---|---|
| **Total Liquidation Value, Gross** | | | **1,600** | |
| less:  Chapter 7 Trustee Fee | | | - | |
| less:  Chapter 7 Trustee Counsel | | | (1,600) | |
| **Total Liquidation Value For Distribution** | | | **-** | |

Notes:
(1)  Cash on hand will be consumed by final payroll, professional fees, and other wind-down costs.
(2)  Given the need for sustained maintenance, competitive market alternatives, and the specialized design of the IP, we assigned a value of zero.
(3)  The accrued administrative fee is based on the contractual language in each clinic's administrative agreement.  Given the lack of sufficient cash flow at the clinic level and insufficient liquidation value, we assigned a value of zero.
(4)  The clinic loans are unsecured and any recovery would be hindered by both the meager proceeds from the clinics and be diluted by other creditors of the clinics. In addition, any claim would be further diluted by MedTruly's cost to pursue the claim.

ENTERPRISE VALUATION
AS OF SEPTEMBER 30, 2023
FINANCIAL PROJECTIONS
CURRENCY IN ACTUALS (unless otherwise noted)

| | | Sept 30, | Projected Fiscal Year Ending September 30, | | | | |
|---|---|---|---|---|---|---|---|
| | | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| Number of Clinic / Year End | | 4 | 4 | 4 | 4 | 4 | 4 |
| *year over year growth* | | *n/a* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| | | | | | | | |
| Number of Clinic Patients / Year End | | 5,769 | 5,962 | 6,162 | 6,368 | 6,581 | 6,801 |
| *year over year growth* | | *n/a* | *3.3%* | *3.3%* | *3.3%* | *3.3%* | *3.3%* |
| Number of Digital Patients / Year End | | 776 | 966 | 1,113 | 1,231 | 1,330 | 1,414 |
| *year over year growth* | | *n/a* | *24.4%* | *15.3%* | *10.6%* | *8.0%* | *6.4%* |
| | | | | | | | |
| In-Person Revenue | | 1,485,391 | 2,786,937 | 2,880,221 | 2,976,628 | 3,076,261 | 3,179,230 |
| *implied revenue per clinic patient* | | *257.5* | *467.4* | *467.4* | *467.4* | *467.4* | *467.4* |
| Digital Revenue | | 554,525 | 704,099 | 824,423 | 927,229 | 1,011,150 | 1,082,183 |
| *implied revenue per digital patient* | | *714.6* | *729.1* | *740.6* | *753.0* | *760.5* | *765.3* |
| **Total Clinic Revenue** | | **2,039,916** | **3,491,037** | **3,704,645** | **3,903,856** | **4,087,411** | **4,261,412** |
| *year over year growth* | | | *6.1%* | *5.4%* | *4.7%* | *4.3%* | |
| | | | | | | | |
| Clinic Cost of Good Sold | | 1,159,912 | 1,382,190 | 1,469,199 | 1,546,699 | 1,618,385 | 1,686,559 |
| *% of total clinic revenue* | | *56.9%* | *39.6%* | *39.7%* | *39.6%* | *39.6%* | *39.6%* |
| | | | | | | | |
| Clinic Gross Profit | | 880,004 | 2,108,847 | 2,235,445 | 2,357,157 | 2,469,026 | 2,574,853 |
| *% of total clinic revenue* | | *43.1%* | *60.4%* | *60.3%* | *60.4%* | *60.4%* | *60.4%* |
| | | | | | | | |
| Clinic Operating Expenses | | 1,062,480 | 1,428,234 | 1,479,530 | 1,531,889 | 1,585,159 | 1,639,620 |
| *% of total clinic revenue* | | *52.1%* | *40.9%* | *39.9%* | *39.2%* | *38.8%* | *38.5%* |
| | | | | | | | |
| **Clinic Level Cash Flow** | **A** | **(182,476)** | **680,613** | **755,916** | **825,268** | **883,868** | **935,234** |
| *% of total clinic revenue* | | *-8.9%* | *19.5%* | *20.4%* | *21.1%* | *21.6%* | *21.9%* |
| | | | | | | | |
| Accrued Admin Fee / MedTruly Revenue | | 8,987,736 | 11,390,400 | 11,390,400 | 11,390,400 | 11,390,400 | 11,390,400 |
| *% of clinic level cash flow* | | *-4925.4%* | *1673.6%* | *1506.8%* | *1380.2%* | *1288.7%* | *1217.9%* |
| | | | | | | | |
| MedTruly Level Expenses | B | 1,028,913 | 1,130,207 | 1,227,785 | 1,325,787 | 1,433,589 | 1,552,172 |
| *% of total clinic revenue* | | *50.4%* | *32.4%* | *33.1%* | *34.0%* | *35.1%* | *36.4%* |
| | | | | | | | |
| **MedTruly Level Cash Flow** | **A - B** | **(1,211,389)** | **(449,594)** | **(471,869)** | **(500,518)** | **(549,722)** | **(616,938)** |
| *% of total clinic revenue* | | *-59.4%* | *-12.9%* | *-12.7%* | *-12.8%* | *-13.4%* | *-14.5%* |

# EXHIBIT B

| Name | Mailing Address | Expiration | Description |
|---|---|---|---|
| Howard Miller MD PS | 920 N 1st St, Renton, WA 98057 | Indefinite | Contracts |
| Freeland Primary Care PLLC | 5577 Van Barr Pl, Freeland, WA 98249 | Indefinite | Contracts |
| Gregory Talalayevsky, MD PC | 1272-74 Hyde Park Ave, Hyde Park, MA 02136 | Indefinite | Contracts |
|  |  |  |  |
| MD and DF Properties | 165 SE Ely Street, Oak Harbor, WA 98277 | June 1, 2026 | Lease |
|  |  |  |  |
| Alphabet Inc | 1600 Amphitheatre Parkway, Mountain View, CA 94043 | Indefinite | Contracts |
| Slack LLC (Salesforce Inc) | 415 Mission St, San Francisco, CA 94105 | Indefinite | Contracts |
| Amazon.com Inc | 410 Terry Ave N, Seattle, WA 98109 | Indefinite | Contracts |
| Bill.com LLC | 6220 America Center Drive, Suite 100 San Jose, CA 95002 | Indefinite | Contracts |

# EXHIBIT C

# EXHIBIT C

## Class 3:

| Claim No.: | Name | Amount | |
|---|---|---|---|
| 2-1 | Brex, Inc. | $29,848.30 | |
| 4-1 | Dhillon Law Group | $18,014.95 | |
| 6-1 | Pavol Kolencin | $17,992.00 | |
| 9-1 | Eugene Gu | $30,000 | Disputed |
| | BillVolt | $15,200 | |
| | Candid Health | $26,075.00 | |
| | Health Gorilla | $9,000.00 | |
| | Hooper Lundy & Bookman, P.C. | $24,673.00 | |
| | | | |

## Class 4:

| CLAIM No. | Date Filed | Name | Amount |
|---|---|---|---|
| 7-1 | 3/6/2024 | Howard B. Miller MD, Inc. PS | $7,500.00 (GUC)[2] |
| 8-2 | 3/11/2024 | Roy Nicolas Chang | $220,468.81 (GUC)[3] |
| | | | |
| 10-1 | 3/6/2024 | Jane Gu and Yuan Gu | $50,000.00 (GUC) |

| Claimant | Amount |
|---|---|
| | |
| Aleksander Ablovatskiy (Sch. F) | $25,000.00 |
| Alexander Weiss (Sch. F) | $50,000.00 |
| Ann Miller Mattocks (Sch. F) | $100,000.00 |
| Anna Heymann (Sch. F) | $35,000.00 |
| | |
| Cake Ventures (Sch. F) | $500,000.00 |

| | |
|---|---|
| Christina LaMontagne (Sch. F) | $5,000.00 |
| Cuong Trinh (Sch. F) | $25,000.00 |
| David Lortscher (Sch. F) | $300,000.00 |
| David Quiec (Sch. F) | $50,000.00 |
| Derek Butts (Sch. F) | $25,000.00 |
| Global Founds Capital GmbH (Sch. F) | $200,000.00 |
| | |
| | |
| Hustle Fund II, L.P. (Sch. F) | $500,000.00 |
| Jay Desai Holdings, LP-II (Sch. F) | $100,000.00 |
| Judith Feder (Sch. F) | $50,000.00 |
| Kevin Nazemi (Sch. F) | $50,000.00 |
| Kima Ventures II (Sch. F) | $500,000.00 |
| Ling Chen (Sch. F) | $20,000.00 |
| ME FUND I (Sch. F) | $400,000.00 |
| Nathan Kondamuri (Sch. F) | $10,000.00 |
| Necessary Ventures Fund I, LP (Sch. F) | $750,000.00 |
| Paul Jorgensen (Sch. F) | $150,000.00 |
| Phillip Ho (Sch. F) | $250,000.00 |
| Prime Access Capital, LLC (Sch. F) | $250,000.00 |
| Richard Vinroot (Sch. F) | $100,000.00 |
| Rocket Internet Capital Partners (Euro) II SCS (Sch. F) | $196,000.00 |
| Shlomit Harth (Sch. F) | $40,000.00 |
| Shrestha Living Trust (Sch. F) | $100,000.00 |
| Sophia Edelstein (Sch. F) | $10,000.00 |
| Stephane Rufer (Sch. F) | $50,000.00 |
| The Khurram Mahmood Trust (Sch. F) | $200,000.00 |
| Thomas Nahigian (Sch. F) | $25,000.00 |
| Tyler Elliston (Sch. F) | $25,000.00 |
| Vermilion Ventures L.P. (Sch. F) | $500,000.00 |
| Yuri Namikawa (Sch. F) | $5,000.00 |